## THE STRANGER.

### FITZPATRICK *et al. v.* THE STRANGER.

#### RECTOR *v.* FITZPATRICK *et al.*

*(District Court, S. D. New York. January 22, 1891.)*

COLLISION—STEAM AND SAIL—CROSSING BOWS—FLASH LIGHT—MUTUAL FAULT.
The steam-tug Stranger, shoving one canal-boat ahead of her, and having others lashed along-side, in going up the North river, when little above Stony Point, came into collision in the night-time with the schooner E. coming straight down. At the time of collision, she had swung so as to head nearly straight across the river, to the eastward. *Held,* upon conflicting evidence, (1) that the tug was previously to the westward of the line of the schooner's course, and improperly attempted to cross her bows; (2) that if, as alleged, the E.'s green light was obscured, the night was not so dark as to prevent seeing the schooner, at least a quarter of a mile distant; (3) that the E. was in fault for not exhibiting a flash or torch light, and that this was material. The damages and costs were divided.

In Admiralty.
*Goodrich, Deady & Goodrich* and *Mr. Foley,* for Fitzpatrick *et al.*
*Hyland & Zabriskie,* for the Stranger.

BROWN, J. The schooner Evoline in coming down the North river, at about half-past 12 in the morning of September 24, 1889, when a few hundred yards above Stony Point, came into collision with the canal-boat Sweet, which was in tow on the port side of the steam canal-boat Stranger; both sustained damages, for which the above cross-libels were filed. The Stranger was shoving another canal-boat placed immediately ahead of her, the Hathaway, and the Sweet on her port side lapped each boat about half-way. The schooner had a light breeze aft, and was coming very slowly at about the first of the ebb-tide. The canal-boat, with her tow, was also going at moderate speed, estimated at from two to four knots. Both were proceeding, according to the testimony, very near mid-river. There is no charge that the schooner changed her course, but it is alleged that she did not show any colored lights, nor any flash light, and that she could not be seen until the time when she was first observed by the pilot of the Stranger, estimated at from 200 to 300 feet distant, when he observed her apparently coming head on, and, after blowing several blasts of the whistle, he ported his wheel and steered

strongly to starboard. The schooner struck the Sweet about midships, which would be about the middle line of the fleet, and all the witnesses agree that, at the moment of collision, the steamer and tow were heading almost straight across the river. The witnesses for the schooner, including Gager, the engineer of the Stranger, testified that their colored lights were properly set and burning, and had been from the time the vessel weighed anchor; and that the green light was not raised a few moments only before collision, as the Stranger's witnesses assert. No flash light was shown. All the witnesses for the schooner state that the Stranger, until she sheered across the schooner's course, bore considerably off their starboard bow, and would have gone well clear to the westward had she not sheered to the eastward.

1. Assuming that the schooner did not change her course, (that being neither charged nor testified to by any one,) the fact that the Stranger with her tow had sheered nearly 8 points to starboard before collision, and that the Sweet was struck about 100 feet aft of the head of her tow, is conclusive evidence to my mind in support of the schooner's contention, that the Stranger and her tow, previous to collision, were coming up well to the westward of the schooner's course, and that the collision was really brought about through the unjustifiable attempt of the steamer to cross the schooner's bow to starboard. So great a change of heading, and by a long tow made up in that manner, could not have been effected without a very considerable change of position in the river to the eastward, and this is strongly confirmed by the testimony of Gager. Some of the defendant's witnesses speak of seeing the schooner on their port bow; but this is evidence only that they did not see her at all, until the steamer, by her own swing to starboard, had brought the schooner on her port hand. No justification appears for crossing the schooner's bow. The night was not dark; and even if her green light, which I am satisfied was hung up, was during a part of the time obscured, which is possible from its position on the rigging 15 feet above deck, the schooner should have been seen at least a quarter of a mile distant, as all agree that both shores were visible. If the westerly shore was high, the easterly shore was low and did not darken the river.

2. The schooner, however, is in fault for not complying with the statute that required the exhibition of a flash or torch light on the approach of the steamer. Although one of the steamer's vertical lights was out, yet the other lights showed her to be a steamer, and the schooner so understood. She was bound, therefore, to comply with the statute. *The Wyanoke,* 40 Fed. Rep. 702. I cannot find that the absence of a flash light was immaterial, or that it would not have given additional information to the steamer, by lighting up the hull and sails of the schooner, and more or less of the river between the two vessels. Such a light might have given just such additional information as regards the heading, or the distance, or the course of the schooner, as to have prevented crossing her bows, which was the immediate cause of the collision. The damages and costs are therefore divided.